[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The ultimate question in this case is whether the concrete business of the defendant, as operated, constitutes a nuisance to the plaintiffs such that it should be curtailed by a permanent injunction. The short answer is that it does not.
 Procedural Case History
CT Page 15073
This action, seeking injunctive and other relief, was originally commenced in Hartford by writ and verified complaint of December 24, 1993, seeking injunctive relief and money damages. The initial primary focus of the action was a proposed asphalt plant of the defendants. By order of September 26, 1994 the case, and its companion case involving the same parties, Docket # 94-046081, were transferred to New Britain.[1]
After an evidentiary hearing, by order of July 19, 1995, as clarified by order of August 3, 1995, the court dismissed that portion of the amended complaint relating to the proposed asphalt plant on defendants' property, for lack of justiciability. It did not dismiss that portion of the complaint seeking injunctive and monetary relief from defendants' concrete operation on Camp Street in the town of Plainville, Connecticut (Plainville).
At the beginning of the trial, plaintiffs filed their Re-Amended Complaint in one count against defendants, seeking injunctive relief and damages for both the creation of a nuisance in terms of noise and dust/dirt emissions, and for buffer zone violations, in connection with the defendants' concrete plant and related operations. The plaintiffs are not claiming any odors from those activities.
The parties stipulated to the substitution of A. Aiudi 
Sons, LLC, as successor in interest to the original defendants A. Aiudi Sons, a Connecticut partnership doing business on Camp Street, Plainville, Connecticut, and the estate of Joseph Aiudi. Elmo Aiudi, one of the principal partners in A. Aiudi Sons and one of the managing agents of defendant A. Aiudi Sons, LLC is the other defendant (collectively Aiudi). The plaintiffs are Nelson and Jeannette Granger (Grangers), Robert and Patty Mastrianni (Mastriannis), Dennis and Christine Heckman (Heckmans) and Gladys Pietrowicz (Pietrowicz) all of whom live in the general vicinity of the concrete plant.
Evidence was taken on 11 trial dates, concluding in 1998. The court heard from 15 witnesses, 8 of them experts, and received approximately 140 exhibits. The plaintiffs and defendants each subsequently filed a lengthy Proposed Findings of Fact, a Brief, and a reply brief. Pursuant to defendants' motion, the court viewed the environs relevant to the suit, including the premises of all parties, on July 29, 1998 in the company of counsel for each party.[2]
CT Page 15074
 The Parties, the Plant and the Neighborhood
The Grangers own 6 Austin Place, off of North Washington Street, in Plainville, Connecticut and have lived there since 1969. North Washington Street intersects with the east end of Camp Street. Nelson Granger operates a business out of his home, which is located in a General Industrial (GI) zone. The Aiudi property is approximately 800 feet down a railroad track from the Granger property line and the Granger house is approximately 130 feet farther back. The Mastriannis own and reside at 261 Camp Street, Plainville, Connecticut. Their property is located 400 feet from defendants' property and approximately 500 yards from the entrance to the Aiudi facility. Robert Mastrianni built his home himself. They have resided at such address since 1989.
The Heckmans own and reside at 263 Camp Street, Plainville, Connecticut and have done so since 1990. The Heckman residence is approximately 2/10th mile from the entrance to the Aiudi plant.
Gladys Pietrowicz owns and resides at 160 Camp Street, Plainville, Connecticut and has resided there since 1956. The rear of her property abuts defendants' 17 acre parcel.
Aiudi currently operates a ready-mix concrete business on Camp Street, in Plainville. Most of the Aiudi activities at its plant are not visible to the plaintiffs. But all of the plaintiffs knew there was a concrete plant on Aiudi's property when they purchased their homes. Aiudi owns approximately 17 acres of property on Camp Street in Plainville, which had been zoned General Industrial until November, 1989 when it was rezoned Quarry Industrial (QI property or 17 acres). Aiudi also owns approximately 26 acres abutting this QI property to the west, which is zoned Residential R property or 26 acres).
The QI property has been used as a sand and gravel operation since the 1920s. It was purchased by Elmo Aiudi's father in 1936. Over time, Aiudi installed on the QI property a rock crushing and sand washing plant and concrete plant. The rock crusher was installed in 1936 and the concrete plant was built in 1941.
Trap rock (stone), sand and cement are the raw materials used to make ready-mix concrete. Aiudi currently uses the QI property to crush stone into aggregate, to process and wash sand, gravel and crushed stone, and to manufacture concrete. These uses are allowed in a QI zone. CT Page 15075
Aiudi obtained a permit from the Plainville Planning and Zoning Commission to excavate material from its natural state on the R parcel in May, 1993 for two years. During this permit period, Aiudi cut down trees and excavated material on the 26 acre piece. On November 14, 1994, Aiudi entered into an agreement with the plaintiffs in the companion case to confine his excavation to a specified area.
There does not appear to be any current excavation of material from the R parcel but Aiudi now trucks unprocessed sand and gravel onto the R parcel and stores it there, regularly traversing the property line between the two parcels to store, process and retrieve aggregate for use in making concrete on the QI parcel.
In 1989, approximately 180,000 tons of uncrushed stone was processed through the QI site for use in manufacture of concrete, for sale or for storage. Approximately the same amount was processed through the site in 1996. All the raw materials must be trucked onto the QI site. Aiudi has approximately 12 dump trucks on the QI property, not all of which are in operation. Aiudi has storage piles of materials on QI property, including uncrushed and crushed stone, sand and gravel and washed and crushed sand and gravel.
In 1989, Aiudi manufactured at least 100,000 cubic yards of concrete at the QI site, almost all of which was removed from the site by concrete mixers. At least 100,000 cubic yards of concrete was processed by Aiudi in 1996. The 1996 total is an estimate, and the precise volume cannot be determined because of a lack of records. Aiudi has approximately 21 concrete mixers garaged and serviced on the site, not all of which are always in operation. It generally takes about 10 minutes to load a cement mixer and only one mixer can be loaded at a time. They are not always fully loaded.
Aiudi also has other equipment, as well as buildings on the QI property. Aiudi has a service garage on the side of the QI property for mechanical maintenance and repair of its vehicles. It also has an office building on that property.
Aiudi's hours of operation differ depending on the season and demand. There is no normal starting time because of the variable nature of the business. During the busy construction season, CT Page 15076 hours vary according to customer demand and there are times when, due to customer demand, operations may start at 6:00 a.m. or even at 5:00 a.m. and end anywhere between 4:00 p.m. and 8:00 p.m. Aiudi is not open on Sunday. Aiudi also makes concrete during the winter months but at a reduced volume compared to the construction season.
The rock crusher typically starts operation between 7:30 and 8:00 a.m. and runs until about 4:00 to 4:30 p.m., even during the construction season. Hours for dump truck drivers generally run from 7:30 a.m. to 4:30 or 5:00 p.m., even during the construction season. But hours for drivers of cement mixers may be longer, depending on customer demand.
Aiudi's business grew ten-fold from 1978 through 1990, but gross sales from 1987 through 1996 have varied. The highest gross sales were in 1987, 1988 and 1989 and the number of Aiudi employees today is approximately the same as 10 years ago. While plaintiffs subjectively claim that there are more Aiudi trucks today than in 1989, no evidence was offered as to the actual number of Aiudi trucks on the roads today compared to 1989.
The general vicinity of the Aiudi and plaintiffs' properties includes residences, factories, open land, railroad tracks and a highway entrance ramp. There is also a sand pit across the street from the Aiudi plant that is occasionally used by operators of motorcycles and all-terrain vehicles (ATVs), which then generates significant amounts of dust.
The present roadway system in the area is above capacity and the area's street intersections are recognized as among the worst in the Town of Plainville. While defendants' trucks use Camp Street and North Washington Street, not all traffic on those streets can be attributed to Aiudi. The plaintiffs complain of Aiudi truck traffic noise but acknowledge that there are occasions when other traffic disturbs them.
Prior to the Aiudi announcement of a proposed asphalt plant, none of the plaintiffs ever made any complaints to Aiudi concerning the use of its property as a concrete plant. Prior to the institution of this lawsuit, none of the plaintiffs had made any complaints to Aiudi concerning noise and dust from its facility. As of the time of trial, none of the plaintiffs ever sought enforcement of Aiudi's claimed violation of the 50' buffer on the QI piece through the Town of Plainville or its zoning CT Page 15077 enforcement officials. Nor had the plaintiffs ever filed a complaint with the state Department of Environmental Protection (DEP) or any other agency claiming violations of noise or air quality standards by Aiudi.
The plaintiffs' suit has essentially been financed by Tilcon, a non-party major concrete competitor of Aiudi and an asphalt producer. The plaintiffs were clearly unaware that approximately $70,000 in plaintiffs' expert fees, and between $90,000-$165,000 in fees for the three plaintiffs' attorneys, had been incurred as of the end of trial.
 The Test For Injunctive Relief
The standard for the consideration of permanent injunctive relief in Connecticut is well recognized. It is axiomatic that "[a] party seeking injunctive relief has the burden of alleging and proving irreparable harm and lack of an adequate remedy at law." (Internal quotation marks omitted.) Berin v. Olson,183 Conn. 337, 340, 439 A.2d 357 (1981).
Our Supreme Court has often held that the issuance or denial of an injunction rests in the sound discretion of the trial court. O'Neill v. Carolina Freight Carriers Corporation,156 Conn. 613, 618, 244 A.2d 372 (1968); Taylor v. Conti,149 Conn. 174, 181, 177 A.2d 670 (1962); Adams v. Greenwich Water Co.,138 Conn. 205, 218, 83 A.2d 177 (1951). "In exercising its discretion, the court, in a proper case, may consider and balance the injury complained of with that which will result from interference by injunction." Moore v. Serafin, 163 Conn. 1, 6,301 A.2d 238 (1972).
Of course, the plaintiffs must first prevail upon the merits of their substantive claim. Here they allege both a common law nuisance as to sound and particulate emissions and a violation of the Plainville Zoning Ordinances as to buffer zones between the QI parcel and adjoining residential parcels, including the 26 acre parcel owned by Aiudi. They seek a permanent injunction prohibiting Aiudi from operating or generating truck traffic on weekdays before 6:30 a.m. and after 7 p.m., and on Saturdays before 7:30 a.m. and after 1 p.m. They also seek a permanent injunction prohibiting Aiudi from operating until it removes all structures and materials from the QI parcel buffer zone and from traversing the zone to access the R parcel. CT Page 15078
"To establish a nuisance four elements must be proven: (1) the condition complained of had a natural tendency to create danger and inflict injury upon person or property; (2) the danger created was a continuing one; (3) the use of the land was unreasonable or unlawful; (4) the existence of the nuisance was the proximate cause of the plaintiffs' injuries and damages. . . . Whether any of those essentials exist is ordinarily a question of fact." (Internal citations omitted)Filisko v. Bridgeport Hydraulic Co., 176 Conn. 33, 35-36,404 A.2d 889 (1978).
As to the claim for injunctive relief based upon the violation of the buffer zones, the law allows such under certain circumstances. "Though the primary responsibility for enforcing zoning regulations rests with the zoning commission, where a violation results in special damage to an individual, the injured party has a right to seek injunctive relief." Schomer v.Shilepsky, 169 Conn. 186, 194, 363 A.2d 128 (1975).
 The Claim of Nuisance Due to Noise
One of the two grounds of nuisance claimed by plaintiffs is noise from the Aiudi facility and traffic. In support of their claim, plaintiffs presented their anecdotal recollections and the testimony of Allan Smardin (Smardin). Smardin has an electrical engineering degree but is not a licensed professional engineer. He has an acoustics firm and has been performing noise measurements for 35 years.
In contradiction to plaintiffs' claim, the defendants presented the testimony of Bennett Brooks, who has a graduate degree in acoustics, is a licensed professional engineer in Connecticut, has made numerous peer presentations and published many written reports and articles. He is also a member of the Acoustical Society and serves on the ANSI standards committee in his field.
Their respective findings conflict in many regards and their opinions are almost opposites. The court finds the testimony of Brooks to be more credible and persuasive. Smardin's documentation of his tests fail to conform with the industry standards in several respects, including the lack of precise times and lack of documentation of relevant impacting weather conditions such as wind speed, wind direction, precipitation and temperature. Further, Brooks' observations and characterizations CT Page 15079 as to audible noise at the various relevant locations (the Aiudi site and the plaintiffs' homes) are consistent with the court's observations in its view of the premises; however Smardin's are not.
The Aiudi operation is in compliance with the Connecticut DEP noise regulations as to all the plaintiffs' sites, both as to steady state (continuing) noise and as to impulse (momentary) noise. But the inquiry does not end there, for the regulations themselves indicate that compliance is neither a bar to a nuisance claim nor non-compliance a per se nuisance. Regs. Conn. State Agencies Sec. 22a-69-1.5.
However, the ANSI industry standards are essentially the same as the Connecticut regulations. It is generally accepted in the industry of noise measurement that annoyance to a hearer occurs when the noise exceeds 10 dBA above the background noise level.
The noise level at the Pietrowicz property when the Aiudi facility is operating is 59dBA. When the Aiudi facility is not operating, it is 52dBA. By way of perspective, a normal conversation at 5' distance is approximately 65dBA. The sound of the Aiudi operation is discernible in the backyard of Pietrowicz but it is not so loud or of such a tone as to be annoying.
The facility noise is not even audible above general background noise at the Grangers, Mastriannis and Heckmans properties. In short, the Aiudi operations do not operate at a human noise annoyance level with regard to these plaintiffs' homes.
Plaintiffs have also raised the question of noise due to Aiudi traffic. There is no doubt that Camp Street carries a heavy traffic load. Brooks' observations in the late afternoon led to an estimate of as many as 500 vehicles per hour at that time of day. Such traffic produces a high level of background noise up and down Camp Street. Generally, cars produce sound in the 70s dBA and trucks in the 80s dBA. The state Department of Transportation, which deals with registered road vehicle traffic allows 88 dBA for large trucks on hard pavement at less than 35 mph, as measured at 50'.
The Aiudi entrance is located on Camp Street. In one direction down that street is the Pietrowicz property, adjacent to a three-way intersection. In the other direction down that CT Page 15080 street are the Heckman and Mastrianni properties, near another intersection. Clearly, Aiudi traffic must go one way or another down Camp Street to access the roads and streets of the town and state.
No reliable evidence was presented as to the total traffic count for Camp Street or Washington Street (Austin Place is not a through street) except for Brooks' estimate of late afternoon traffic. No reliable evidence was presented as to the percentage of such traffic generated by the Aiudi facility. No reliable evidence was presented as to the total volume, or Aiudi's contribution, for the hours sought to be curtailed by the requested injunction. Although multiple experts in several disciplines were presented as witnesses, no one did a comprehensive, current traffic count.[3]
Smardin did present evidence of Aiudi trucks, on one day, exceeding the 88dBA limit in eleven cases by only two to five dBA but his testimony indicated the measurements were 30' from the street, at 160 Camp Street while Exhibit 47 indicates the measurement occurred at the stop sign, where the noise from brakes would be loudest. It appears the results reflect a measurement from closer than 50', which would skew the result to the high side. For this reason and the reasons cited previously, the court does not find these results credible or probative.
The court's own observations, on a summer midweek midmorning,[4] confirmed that Camp Street and North Washington Street carry a steady stream of traffic, of which only a small part is Aiudi related. The great majority of vehicles are passenger cars. Large trucks, not belonging to Aiudi or accessing the Aiudi plant, use the street in addition to Aiudi's trucks.
The court finds that the Aiudi operations, including traffic, do not have a tendency to create danger and inflict injury upon the plaintiffs and are not unreasonable, with regard to noise produced. The court finds that Aiudi has not created a nuisance as to plaintiffs by reason of noise.
 The Claim of Nuisance Due to Dust/Dirt Emission
Plaintiffs also claim that Aiudi has created a common law nuisance by dirt and/or dust emissions, called particulates by air quality experts, from the concrete plant and its related operations. In support of their view they offer their own CT Page 15081 observations and the testimony of one expert, Mitchell Wumbrand, a meteorologist and his theoretical modeling of predicted particulate emissions from the Aiudi site. In opposition, the defendants offer the testimony of three experts, Michael Schum, a licensed professional engineer, John Yocom, also a licensed professional engineer and eminent in the field of air quality, and Norman Bowne, a meteorologist, as well as an actual sampling over five business days of fugitive dust from the Aiudi site. The court also has the benefit of its own view of the Aiudi and plaintiffs sites, as well other relevant local sites.
The plaintiffs all, to some degree, complain of exterior dirt or dust on their property and attribute it in whole or part to the Aiudi plant and operations. Some claim, and some deny, ever seeing the dust migrate from the Aiudi property. Several admit that there is a separate sandy area, on the side of Camp Street opposite the Aiudi plant, where motorcyclists and ATVs roam on weekends, kicking up dust.
They complain of dust on the exterior of their houses and some complain of dust on the interior. They indicate they must rinse their driveways or housefronts or cars or windows or a combination thereof regularly as a result. Some complain of Camp Street being dirty, especially near the Aiudi entrance.
Dennis Heckman complains that he has asthma and that the dust aggravates it but indicates that his asthma is self-diagnosed, and that no medical doctor has either diagnosed or treated it. Pietrowicz, who is the closest to the Aiudi plant, has the most detailed complaints about dust, claiming it creates a film on her swimming pool water and accumulates on her garden plants and windowsills.
Aiudi testified to the various steps he takes during the rock crushing and cement making process to contain dust, rinse the dust from the rocks as they are crushed, clean his paved on site area with a vacuum sweeper and rinse the vehicles before they leave his property. He also confirmed the common presence of twenty or more motorcyclists or ATVs on the sandpit across the street from his plant, raising dust on Saturdays and Sundays, despite his efforts to prevent them.[5]
Wumbrand, plaintiffs' expert testified to his personal observations of a curtain of dust emanating from the Aiudi entrance road and significant, visible quantities of dust and CT Page 15082 damaged leaves on Pietrowicz' property. The court's view of the premises showed, contrary to plaintiffs and Wumbrand's testimony, little or no dust on Camp Street (which was dry), no significant dust or dirt on the plants near the Aiudi entrance, no noticeable dirt on the plaintiffs' houses, no visible quantity of dust or dirt in the air leaving the Aiudi property at any location, a relatively clean and dry entrance to the Aiudi site, no significant visible dust on Pietrowicz's premises, no film of dust on her swimming pool water or pool rim, no noticeably damaged leaves, no dust on her smooth leaved garden plants, and only slight dust on her rough textured garden plant leaves. The view disclosed that between the Aiudi operations and the Pietrowicz house are concrete blocks and a well treed hill. The view also showed the interior paved parts of the Aiudi site to be relatively clean.
Wumbrand, a meteorologist, air quality consultant and member of the American Meteorological Society testified for plaintiffs. He prepared a modeling of predicted air particulate emissions from the Aiudi site using data from an industry standard for modeling known as AP42,[6]. His testimony is that the modeling shows a violation by the Aiudi operations of the state DEP air quality standard, known as PM10, as to Mrs. Pietrowicz's property. Using what the experts here agree is the more appropriate and commonly accepted industry standard for nuisance claims, Total Suspended Particulates (TSP), he says the Aiudi operation also violated those ambient air standards, and one or more of the plaintiffs' properties were in the area of such exceedance.
Such a modeling is an estimate, not a measurement of airborne emissions. It relies on a series of assumptions, with a number of factors, of varying reliability. It assumes the weather is always dry and the plant always operating at full capacity. It also clearly requires some subjective judgments by the modeler as to defendants' operations and as to which AP42 factors he will utilize from an available range. Wumbrand made those subjective judgments without visiting the Aiudi plant site and relying in part upon information obtained from the financier of the suit, Aiudi's competitor, Tilcon. The actual sampling performed by defendants' experts and the court's firsthand observations do not bear out the modeling conclusions.
Yocom, one of defendants' experts, is a professional engineer who has published more than sixty articles, primarily in the area CT Page 15083 of air pollution measurement and effect, taught at the University of California at Berkley, Yale and NYU and worked at several research institutes. He is a fellow of the Air Waste Management Engineers Society and worked on six or more Portland Cement plants. He structured the sample testing, which was overseen by Schum.
Schum is a licensed Connecticut engineer who specializes in air quality. Bowne, a meteorologist and fellow of the American Meteorological Society, also participated in setting up the sampling.
TSP, as the appropriate industry measure to determine the existence of a nuisance was measured by the sampling, which took place in November, 1994. Three measuring stations at various upwind and downwind locations were used, two of them being near a plaintiff's property. The sampling recorded some particulates from the Aiudi facility and some not from the Aiudi facility. It showed no violation by the Aiudi facility of the industry standard of 260 micrograms per cubic meter.
Having viewed the area, the sampling results and relying on their respective expertise, Yocom, Bowne and Schum all opined that the level of fugitive dust from the Aiudi facility did not unreasonably interfere with plaintiffs' use of their properties.
Yocom testified that most fugitive dust from concrete plants is not inhaleable and there is no reason to believe that the Aiudi facility presents a health hazard to plaintiffs. He further noted that firsthand observation of the sites do not show the physical results of dust, which should be visible if Wurmbrand's modeling prediction was accurate.
The court does not find the modeling analysis or conclusions of Wurmbrand credible. While the Schum test was for a limited period, and is therefore not ideal, it reflects an actual measurement of the airborne particulates from the concrete operation and site in dispute. The court finds the test results, and the opinions of Schum, Bowne and especially Yocom to be convincing.
Weighing all the evidence on this issue, the court finds with regard to dust and dirt emissions that the Aiudi operations do not have a tendency to create danger and inflict injury upon the plaintiffs, and are not unreasonable. The court finds that Aiudi CT Page 15084 has not created a nuisance as to plaintiffs by reason of dust or dirt emissions. Accordingly, no irreparable injury has been proven as to any of plaintiffs' claims.
 The Claim of Special Damage Due to Zoning Violations
Plaintiffs have pled in their complaint that Aiudi has violated the Plainville Zoning Ordinance section 400 by improperly using the 50' buffer between the QI parcel and all adjoining residentially zoned property (including the R parcel), causing special damage to plaintiffs.[7] Evidence at trial clearly shows the defendant has placed rock and sand piles, settling ponds, piping, a concrete block wall and other items within 50' of the QI boundary, as well as routinely traversed the 50' of the QI parcel bordering Aiudi's R parcel to obtain material stored there. Defendants have both contested the applicability of the buffer zone to certain uses of that area and excused the uses as prior non-conforming uses.
But these issues are only of relevance to this action if the use of the 50' buffer areas causes special damages to plaintiffs. Our Supreme Court has made it clear that a private individual may seek injunctive redress for zoning violations from the court, as opposed to seeking redress from local zoning authorities, only if he suffers some special damages from that violation. Schomer v.Shilepsky, supra, 169 Conn. 194; Cummings v. Tripp,204 Conn. 67, 90, 527 A.2d 230 (1987); Blum v. Lisbon Leasing Corp., Inc.,173 Conn. 175, 179, 377 A.2d 280 (1977).
Even assuming arguendo that defendants' activities both violate the buffer zones and are not valid prior non-conforming uses, the plaintiffs have not suffered special damages from the use of the buffer areas. For the reasons set forth previously in this decision, Aiudi has engaged in a reasonable operation of the facility as a whole, and it is neither a nuisance as to noise nor as to particulate emissions. What is true of the facility as a whole is certainly also true as of the 50' area at its perimeter.
Nor does the court find any specific economic damage to plaintiffs by reason of Aiudi's activities within the 50' at the perimeter of the QI parcel. Peter Marsele, the appraiser called by plaintiffs, testified only as to the Pietrowicz, Heckmans and Mastriannis properties. He did not quantify any diminution of the properties value due to activities within the buffer zone. His testimony, taken as a whole, makes it clear that in valuing the CT Page 15085 properties he did not consider the impact of any buffer zone use separate from the impact of the entire Aiudi concrete operation. And he did not even attribute a dollar amount to any diminution in value due to the concrete plant because it existed before each of the plaintiffs acquired their properties.
Pietrowicz is the only plaintiff in close proximity to a buffer zone on the QI property. Marsele indicated that as to the concrete wall within the buffer zone near the Pietrowicz property, "the encroachment is so small that any change would be minor because it is not encroaching the fifty foot line to any major degree with respect to her property."
The court has viewed the plaintiffs' properties and the various activities of Aiudi within the 50' perimeter of the QI parcel. There is no economic or other special damage to plaintiffs from those activities. Therefore plaintiffs are not entitled to any injunctive relief as to their claims that Aiudi has violated the Plainville zoning ordinance as to the QI buffer areas.[8]
Plaintiffs also seek money damages, in addition to injunctive relief, for their claims of nuisance and zoning violations. The court having found no nuisance nor damages from any such zoning violations, plaintiffs are not entitled to same.[9]
While defendants pled various other special defenses including, inter alia, unclean hands by reason of Tilcon financing this litigation, and plaintiffs replied in denial and avoidance thereof, the court need not and does not reach these issues in light of the above.
Judgment will enter for defendants.
James T. Graham Superior Court Judge